Good morning, may it please the court. Jarrett A. Green for petitioner He Yung-Fang. And this case is consistent with the theme apparently of today, which is China's blatantly illegal policy regarding North Korean immigrants. It's a policy that's blatantly discriminatory and consistent with humanitarian principles and violative of international law. Mr. Fang, my client, fundamentally disagreed with that policy. Two women showed up hungry, thirsty at his door and he knew of the policy and he fundamentally disagreed with the policy, so he violated the policy and he was horribly, horribly persecuted for doing so. Before I get into adverse credibility, well, I do want to answer Judge Hoen's question from before, but I was preparing yesterday for this hearing and someone sent me an email, said, you know, did you hear the news today? Anyone, you know, and then I followed up on it. Most people in this courtroom probably saw that the Associated Press yesterday reported, and it was on CNN, Fox News, everywhere, ABC, NBC, that the North Korean government executed publicly 15 North Korean citizens yesterday, 13 women, two men. And what was the reason? Because they escaped North Korea into China, and because of this Chinese policy, they were rounded up, forcibly repatriated back, and as a statement, a very clear statement, the North Korean government held a public execution by fire squad, lined them up and shot them down. And when I read that article preparing for this case, I, you know, it just, it was emotional because it reinforced that this is not some, you know, philosophical legalese issue, although those are obviously important in their own right. This is a real policy that affects real people, that causes real pain. And I think we've heard that from some of the other cases. Judge Tong, and I want to answer your question that you asked of prior counsel. But what's the distinction between the Chinese policy and our policy about Mexicans? Fair question. The distinction is our policy only prohibits providing assistance or harboring illegal immigrants neutrally, whether it's Mexicans, Guatemalans, Dutch people, anyone. The Chinese policy only applies to North Korean immigrants. In fact, people from Laos, Vietnam, bordering countries, anywhere else come in, and this policy does not apply to them. And that's one fundamental distinction. Ours is neutral. Counselor, you'll have to refresh my memory. I don't ever remember having any other immigration case in which somebody fled to Red China besides the North Koreans. Have we, did you, in your research, did you encounter any other cases where, where we were trying to deport Laotians or Cambodians who had gone to China? I can't say that I have, but that, you know, it's a separate issue on whether or not the North Korean policy is expressly discriminatory, whether or not that discriminatory policy is affected. I'm not sure. I mean, if I were in Laos, I don't know the conditions today in Laos or Cambodia, but what I know of Red China, if you were going to flee conditions in a country, I'm not sure you'd go to China. But if you were in North Korea, you might, notwithstanding. Why is that? Because of the location? No. Yeah. And they can't get across the demilitarized zone because it's so heavily mined. Sure. Okay. Absolutely. But I mean, the fact that people from Laos or, you know, Bangladesh and Cambodia, which are very close and obviously very impoverished as well, they must flee to somewhere. The fact that those people don't particularly. Here. Here. It's a good place to go. Everybody comes here, Mr. Green. So, and I don't blame people for that, but let, you know, let's not kind of forget that even if everyone wants to be here, the real central question is what is China's policy about? And it's just blatantly discriminatory. But the second answer to your question. Discriminatory, or is it your real, not necessarily discriminatory, it's anti-humanitarian. It violates international law. It's an abysmal way to treat anybody. No doubt. No doubt about it. And your argument is that's imputed political. That's right. And the other thing about the distinction between our policy, our law about Mexico, about illegal immigrants from any country and theirs is we provide asylum, as your honor knows better than anyone, because you sit here every couple of months, just hearing these cases. This is exactly, this proceeding is exactly what's different about our law and the Chinese policy. Their, their official policy is no matter what your explanation might be, if you're a North Korean in our country, you are an economic migrant and there's no chance you're a refugee, which obviously undermines the very purpose of the Refugee Convention. And there's a case I did want to quote. Demise Job, the INS, this court said, quote, Congress specifically passed the Refugee Act of 1980 with the intent of bringing the United States statutory provisions concerning refugees into conformity with the provisions of the United Nations Convention relating to the status of refugees. Another thing is our withholding statute, 8 U.S.C. section 1253 H3B, right? It requires that the Attorney General provide withholding of deportation where doing so is, quote, necessary to ensure compliance with the 1967 United Nations protocol relating to the status of refugees. The United States Supreme Court in Stavik also established that our law is consistent with international law. So that is the critical distinction between the Chinese policy and our law, your honor. You know, the other issue. And I think you said earlier, Red China is not a signatory to They are. I don't know whatever someone else said, but they are a signatory. And Exhibit 7 of the addendum, page 2, China is a signatory on September 24th, 1982 to both treaties. Well, this is very interesting, but I think you better touch on your credibility problem. Absolutely. Let's get back to adverse credibility. The adverse credibility issue in this case, I mean, frankly, the finding, as we established, there were four points that the I.J. based his decision on. And really, this finding was exactly what the court, what this court in Paramasamy was talking about when he, when this court said the I.J. was predisposed to discredit the testimony of the applicant and relied on perceived inconsistencies rather than evidence. Remarkably, in finding my client, although I didn't represent him below, I'll note, in finding my client not credible, the immigration judge did not find a single discrepancy or inconsistency relating to any of the following. My client's account of his actions that led to his persecution, my client's account of the Chinese policy at issue regarding North Koreans, my client's account regarding his fundamental disagreement with that policy, or my client's account of his torture suffered at the hands of the Chinese government for violating that policy. Those are really the, those are the issues that underlie his claim of fear of persecution. And rather stunningly, the immigration judge did not even comment or find any inconsistencies with respect to those critical issues. Instead, he relied on- Is this pre-real ID act? Pre-real ID act because it was filed on January 24th, 2003. Real ID kicks in May 11th, 2005. Pre-real ID, it's almost all of them go, you know, do not go to the heart of the claim. But in our brief, both of our briefs, we established that that's only one of the fatal flaws that suffered, that I.J.'s adverse credibility- Could you address the one ground that appears to me to be the strongest in supporting the adverse credibility determination? That is his motivation for coming here, what he told the asylum officer when he entered. Yes, absolutely. So the issue there was, you know, he came here, his claim, obviously, is he escaped persecution. He did leave his wife and his child in China. And, you know, the immigration judge jumped on that and said, wait, if you're actually in persecution, why would you leave your wife, your precious wife and child in a country that you yourself fear? Now, we've discussed the five- Well, my question is a little more focused. Okay. I'm sorry if I didn't articulate it well enough. As I understand the record, he told the asylum officer that basically he was coming here in order to better himself- Right. Achieve his full potential, I think was the word. Sure. Fair enough. Let me read you that testimony. One of the problems with that finding, as we discussed in our brief at pages 32 and 33, was that Mr. Feng consistently testified that the reason he left China was fear of persecution throughout, many times, maybe seven or eight times, page 33 or all the quotations through the transcript. And then at the end of the hearing, the immigration judge, seemingly unwilling to accept that that's why he left, started grilling him. And it turns out, as I'll read you, it turns out that the reason why he came to America, why he chose America as his destination, is different than why he left China. So he left China for fear of persecution, and he chose America to better himself and pick the best place. So let me read you the testimony, which demonstrates- Save your time. I've read the testimony. We know what it says. The problem, though, is there does seem to be an inconsistency in what he said to the I don't see how that's inconsistent. The Ninth Circuit has held in three cases, we also cited those, that coming to America in order to better yourself financially is not inconsistent with leaving your country out of fear of persecution. The two are perfectly mutually inclusive. So that was one distinguished, one critical error he made there. Second, the testimony is very clear. He kept explaining, I left because I was fearful of persecution. Eventually, he said to him, you know, why did you choose America? Why didn't you go somewhere closer? And his answer was, America's full of democracy, freedom, and I could better myself. Right. Like we said, can we really blame- You've used your time. That's the theme for the day. We should be grateful to be here. Absolutely. And he certainly is. Thank you, Your Honor. We should be good. Thank you to you and Scanlon for doing this pro bono. What's that now? Yes. Yes. Thank you for your participation in pro bono. Thank you. May it please the Court. My name is Anthony Norwood. I'm here today representing the Respondent, the Attorney General. Your Honor, I'm confused. The Petitioner seems to be arguing that as a matter of law, people who leave China for violating this policy are entitled to asylum in the United States. If he's asking this Court to make up a legal holding that people who violate this policy are, as a matter of law, entitled to asylum in the United States, I don't think it's appropriate for this Court to do that, and I don't think that it's presented in this case. The question of whether it's a matter of law he's entitled to asylum, this Petitioner has to get over the credibility finding. He was found not credible by Judge Impeacock. If this Court overturns the credibility finding, then it would be appropriate for this Court to remand to the Board of Immigration Appeals to see if the Petitioner is entitled to asylum as a refugee, and that would involve whether it was political persecution, it was ethnic persecution, or, as Judge Opima said, it was extrajudicial treatment, which I would think would be the issue that the Petitioner would want to pursue before the Board of Immigration Appeals, not a blanket attack on Chinese policy towards the North Koreans. Petitioner spent a little time talking about the credibility decision. There were four factors in the credibility decision, and we ask that the Court look at the totality of the credibility finding to uphold Judge Opima's decision under the Substantial Evidence Test. Can I ask you a question addressed to your matter of law argument? What do we do with the fact, and it's the fact in each of these three cases we've heard, that the IJs are all holding that the alien seeking refugee status violated a criminal law in China when there is no such criminal law? Haven't they made a legal error? Your Honor, first, I don't think that's presented in this case, but the... Well, let me help you. This is what the IJ said. Assisting in smuggling and or harboring illegal aliens is a crime under certain circumstances, even in this country. And even if the person who is assisting is of the same ethnic background as the alien he or she is trying to help. And then he goes on to say that could not be political opinion. It's a crime. Now, I think it's been amply demonstrated that it's not a crime in China to give humanitarian aid. And what do we do with the fact that the IJs without citing anything or referring to any specific... In fact, this one's only referring to the law in the United States as making such conduct criminal. He's not even referring to the law in China. Your Honor, petitioner's exhibits, which are not part of the record... We've done our own legal research, you know. Petitioner's exhibits, one of petitioner's declarants says it's not a criminal law in China, but it is a policy in China. Whether it's a policy or a law, this petitioner would... This petitioner has a receipt, has a fine. He paid a fine for violating this policy or this law. If there's no policy, then is that fabricated? If petitioner's claims based on the fact that he was fined for violating the policy... So it's the government of the United States' position that there's a difference between... The Korean... I'm sorry, the Chinese policy of inhumane treatment for North Koreans, refugees, and a law prohibiting helping them. I'm sorry, I don't quite understand the distinction, Your Honor. It would be our position that a simple fine for violating a Chinese law or policy would not be persecution. That's a different argument. I thought I heard you saying that a policy is the same thing as a criminal law. I'm really not an expert on Chinese law, whether a policy is the same thing as a law, or whether this... Nor was the immigration judge either, so... But it's not, as I said, it's not presented in this case, Your Honor. And if the court, based on a credibility decision, if the petitioner is asking this court to find, as a matter of law, a fine for that policy, as a matter of law, is persecution. I simply don't think that's presented to this court, or would be appropriate for this court to do. Petitioner fills the record with statements that the Senate has challenged this policy, and that's perfectly appropriate for Senator Brownback, and for President Bush, to challenge the policy, and for the Secretary of State to challenge the policy, and to try to address the policy. But to find, as a matter of law, a violation of that policy is... So, you know, it really is kind of presented in this case through the argument that by tracking down on only one group, there is an imputed political opinion. And if the I.J. says that this is perfectly okay because they're enforcing a law, that might be a response to the appellant's argument. But if it's not a law, it's just a policy we're going to get the North Koreans, that's a little different, isn't it? It is a little different, but it's not... I mean, it's very different. If, based on a credibility decision, if the court finds him to be credible, this case should be sent back to the board for the board to address this so-called policy or law in the first instance. Okay. Our law is right with, I have to say, discrimination. Historically, United States law did have that. And it's not unusual. Since 1980, we've been trying to get that out of our laws, but it's not presented here that this court should find that the Chinese policy is blatantly discriminatory and establishes as a matter of law that it's persecution. Okay. Do you want to say anything more about credibility? I would like to say about credibility. Petitioner uses the approach to, I would say, slice and dice the immigration judge's credibility decision to use all of the precedent of this court to tear it apart. But if you look at the totality of the immigration judge's decision, I think that the substantial  He looks at the totality of his testimony, told a blatant lie about whether it used his passport, and Petitioner says, you have to look at the totality of the record to understand that blatant lie. We need to look at the totality of the record to support the immigration judge's decision. No further questions? There don't appear to be any. Mr. Green, you have used your time. Does the court have any questions for Mr. Green? Thank you. Again, we appreciate participation in the pro bono project, and we appreciate the arguments of counsel. Case just argued is submitted.
judges: Schroeder, Wardlaw, Tallman